**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 43920**

| | | |
|---|---|---|
| **JANE DOE I (2016-7),** | ) | |
| | ) | |
| Plaintiff-Respondent-Cross-Appellant, | ) | |
| v. | ) | |
| | ) | |
| **JOHN DOE I,** | ) | |
| | ) | |
| Defendant-Appellant- | ) | **Boise, June 2016 Term** |
| Cross-Respondent, | ) | |
| | ) | **2016 Opinion No. 121** |
| **JOHN DOE II and JANE DOE II,** | ) | |
| **husband and wife,** | ) | **Filed: November 2, 2016** |
| | ) | |
| Petitioners-Intervenors, | ) | **Stephen W. Kenyon, Clerk** |
| v. | ) | |
| | ) | |
| **JANE DOE I and JOHN DOE I,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | . |

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Madison County. Hon. Eric S. Hunn, Magistrate Judge.

Magistrate decision on custody arrangement, <u>reversed</u> and <u>remanded.</u>

Thompson, Smith, Woolf, Anderson, Wilkinson & Birch, PLLC and Zachary D. Lords, Idaho Falls, for appellant John Doe I. Aaron J. Woolf argued.

Hopkins, Roden, Crockett, Hansen & Hoopes, PLLC, Idaho Falls, for respondent. Paul B. Rippel argued.

Beard, St. Clair, Gaffney, PA, Idaho Falls for intervenor.

---

BURDICK, Justice

## I. NATURE OF THE CASE

John Doe (Father) appeals the Madison County magistrate court's First Amended Judgment and Order Modifying Prior Court Orders, which modified the custody arrangement

1

between Father and Jane Doe (Mother) that was outlined in the court's Judgment and Order Modifying Prior Court Orders. Father argues that the magistrate court abused its discretion when it modified the custody schedule three separate times despite the fact that no evidentiary hearing was held and the court's prior findings of fact and conclusions of law remained unchanged. Mother cross-appeals, arguing that the magistrate court erred as a matter of law in the findings of fact and conclusions of law it entered in relation to the Order Modifying Prior Court Orders. We reverse the magistrate court's change of custody in its Order Modifying Prior Court Orders.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother are the parents of five minor children, namely, A.O., E.O., R.O., P.O., and D.O. Father and Mother were divorced on June 3, 2011. The divorce decree resolved all of the custody and visitation issues between the parties with the exception of (a) custody and visitation during the school year and (b) visitation with D.O.

These issues were tried to the magistrate on March 5, 2013. After trial, the magistrate court entered its findings of fact and conclusions of law and issued an Order Regarding Custody, Visitation, and Child Support and Judgment (First Custody Order) on March 18, 2014. The First Custody Order awarded Mother primary custody of the parties' five minor children during the school year subject to Father's reasonable visitation. Father's visitation rights included visitation from after school on Fridays until school commences Monday mornings on the first, third, and fifth week of every month, as well as one evening of visitation during the school week.

Shortly after the March 5, 2013 trial, Mother began investigating a move for her and the children to Idaho Falls. Mother informed the children of the potential move and took the children to Idaho Falls to allow them to pick out the school they would like to attend. This took place before the 2012–13 school year had expired.

Father became concerned that Mother and the children might attempt to move to Idaho Falls and instructed his attorney to send a letter to Mother. Father's attorney sent a letter to Mother on July 3, 2013, which stated Father's objection to the move. Neither Mother nor her attorney responded to the letter.

Mother notified Father of the move to Idaho Falls on August 12, 2013, which was two days before it was to take place. Upon learning of the move, Father sought an Ex Parte Order to stop Mother from moving to Idaho Falls with the children. On August 13, 2013, the magistrate entered its Ex Parte Order, which ordered that the children attend the 2013–14 school year at

their respective schools in Rexburg, and that the children continue to reside in Rexburg. The court set the matter for a hearing on September 3, 2013 to determine whether the order should continue or be vacated.

On August 14, 2013, Mother moved with the children from Rexburg to Idaho Falls. When Father learned that Mother was still attempting to move the children to Idaho Falls, he instructed his attorney to send a letter to Mother's attorney with a copy of the Ex Parte Order on August 14, 2013, which his attorney did. Additionally, Father spoke with Mother on August 14, 2013, and Mother informed him that she was aware of the Ex Parte Order from speaking with her attorney. On August 21, 2013, Father filed a Motion for Contempt with the magistrate court against Mother for allegedly violating the court's Ex Parte Order. During this time, Mother engaged in a group text message with A.O., E.O., P.O., and R.O., wherein Mother told the children, in response to being notified that Father was registering them for school in Rexburg, that they "certainly don't have to go," and "that's pretty lame he won't listen to you kids."

The magistrate court held a hearing on the Ex Parte Order on September 3, 2013, after which the court required the children to return to Rexburg and to attend school in Rexburg. After the hearing, Mother told all of the children what the court had ordered, which made the children angry with the court and with Father. The children told Mother that they wanted to plead with Father to allow them to stay in Idaho Falls, which Mother encouraged them to do. The children were extremely angry with Father when he insisted that the court's orders be followed. Approximately three weeks after the hearing on the Ex Parte Order, Mother and the children moved back to Rexburg. After the move, Father's relationship with the children, and in particular the two eldest, was strained. It took approximately two months for Father to mend the relationships with the younger children, but Father's relationship with the two oldest children continues to be damaged.

On April 16, 2014, Father filed a Counterpetition to Modify Prior Court Orders, which was modified on August 22, 2014, wherein he sought an award of primary physical custody of the parties' children. However, apparently Father was conscious of the fact that the two oldest children would probably not agree to live with him even if he was awarded custody. Thus, Father sought an order which would require the two oldest children to attend counseling, and eventually, Father hoped that they would reside primarily with him. Mother filed a reply on

3

September 16, 2014, asserting that Father should not be granted the requested change in physical custody. The issues related to Father's Amended Counterpetition went to trial on July 15, 2015.[1]

Meanwhile, E.O.'s relationship with Father became non-existent in the fall of 2014, which was when Father submitted discovery requests to Mother; Father had settlement discussions with Mother in the park, which Mother told A.O. and E.O. about; and Father filed an affidavit in support of the grandparents' motion to intervene in this case. A.O.'s relationship with Father also worsened in the fall of 2014, but not to the same extent as E.O.'s relationship with him.

The magistrate issued its Findings of Fact and Conclusions of Law on September 1, 2015, where it concluded that Father would have primary physical custody of the parties' three youngest children, while Mother would have primary physical custody of the two eldest children. In so holding, the court found that Mother had engaged in alienating behavior through her actions related to, among other things: the move to Idaho Falls; discussions with the two eldest children about court proceedings; and allowing E.O. to indoctrinate her younger siblings on religious beliefs. However, in the Findings of Fact and Conclusions of Law, the court also determined that Mother was not in contempt of its Ex Parte Order entered on August 13, 2013. The magistrate entered a Judgment and Order Modifying Prior Court Orders (Second Custody Order) on September 15, 2015, which reflected these changes in the custody arrangement.

On September 29, 2015, Mother filed a motion to reconsider, arguing that the Findings of Fact and Conclusions of Law and resulting Judgment were inconsistent with the evidence and did not follow applicable law. Mother's Motion to Reconsider was heard on November 25, 2015. At that hearing, the magistrate ordered that he would not change his Findings of Fact and Conclusions of Law. Despite this pronouncement, the magistrate changed the custody schedule for the parties to a 50/50 shared arrangement, with the children rotating frequently between each parent's home. Specifically, the magistrate ordered:

> But the parenting scenario which I have envisioned for this family will be that dad will have the kids on Tuesdays and Wednesdays, so when kids get out of the school on Tuesday, they will go to his house.
>
> You will have them that night, you will have them all day Wednesday, and he take them back to school on Thursday, and he will have them every other weekend from Friday till Monday. So one week he will have them after school on

---

[1] The trial also dealt with issues related to a Petition that Mother's parents filed as intervenors in the case to establish Grandparents' visitation privileges.

Tuesday, he'll have them Wednesday, he will have them, take them to school on Thursday.

If it's his weekend, he will get them after school on Friday. He will have them Friday, Saturday, Sunday, and he will take them to school on Monday.

After school on Monday, they will come to your house. They will be there till Tuesday after school, where they will go with him. They'll be there Tuesday, Wednesday, and to school on Thursday. That next week will be your weekend. You will have them Thursday, Friday, Saturday, Sunday, Monday, and you will drop them off to school on Tuesday, and after school, they will go to him.

It's a [] pure 50/50, and the longest you're ever away from your kids is about four days, and I think it works. It makes him be a parent in the school realm, it allow[s] you to be a parent in the school realm, and I think that this is what these kids deserve.

The magistrate further ordered that Father, Mother, A.O., and E.O. attend counseling due to the fact that E.O. and A.O. had a strained relationship with Father. The magistrate ordered that the new custody arrangement would not come into effect until the first of the year so as to not burden the children with the change during the holidays. The court added that the custody arrangement was "subject to me seeing something in the reports [from the counselor] that makes me say, wait a minute, I think we need to wait a little bit longer to get this done."

On January 4, 2016, there was a status conference held, which was not recorded. Apparently, at the time of the status conference, the counselor's report had not been completed. Despite this fact, the magistrate ordered the parties to immediately begin to follow the new 50/50 shared custody schedule that it had announced at the hearing on the Motion to Reconsider (Third Custody Order).

On January 11, 2016, Father filed a Motion to Stay, requesting the court stay its order instituting the 50/50 custody schedule, and also filed a Motion for Permissive Appeal to the Idaho Supreme Court. Mother filed an Objection to Motion to Stay on January 12, 2016, but on January 14, 2016, the magistrate entered an Order Re: Motion for Stay without a hearing. Following the entry of the Order Re: Motion for Stay, Mother filed several motions with the magistrate court, including a Rule 108 Motion to Disqualify for Cause; a Rule 807 Motion for a New Trial; a Rule 119 Motion to Allow the Declarations of A.O. and E.O.; a Rule 812 and Rule 814 Motion to Stay; and a Motion for Permissive Appeal.

Father filed an objection to Mother's motions on January 27, 2016. Mother's various motions were heard before the magistrate on February 5, 2016. During the hearing, the

magistrate denied Mother's Motion to Disqualify for Cause; Motion for New Trial; Motion to Allow the Declarations of A.O. and E.O.; and Rule 812 and Rule 814 Motion to Stay. Over Father's objection, the magistrate heard Mother's objection to the Order to Stay that the magistrate had filed on January 12, 2016. The magistrate acknowledged that the Objection was not being timely heard and that it was being heard on the court's own motion. Following the hearing on Mother's objection to the Order to Stay, the magistrate ruled from the bench and rescinded the Order Re: Motion for Stay that had been entered January 14, 2016. In doing so, the magistrate also altered the 50/50 custody schedule to a week on/week off arrangement. The magistrate then granted both parties' motions for permissive appeal.

On February 17, 2016, the magistrate entered its First Amended Judgment and Order Modifying Prior Court Orders (Fourth Custody Order) to reflect the changes in the custody schedule.

This Court entered its Order Granting Motion for Permission to Appeal on February 25, 2016, which was later amended on February 29, 2016. Father filed a Notice of Appeal on February 29, 2016, and Mother filed a Notice of Cross-Appeal on March 4, 2016.

### III.    ISSUES ON APPEAL

1. Whether the magistrate court abused its discretion when it modified the custody arrangement from the First Custody Order.

2. Whether the magistrate court abused its discretion when it modified the custody arrangement from the Second Custody Order despite not making any new findings of fact.

3. Whether either party is entitled to attorney fees on appeal.

### IV.    STANDARD OF REVIEW

In a permissive appeal under Idaho Appellate Rule 12.1, this Court "reviews the magistrate judge's decision without the benefit of a district court appellate decision." *Sweet v. Foreman*, 159 Idaho 761, 765, 367 P.3d 156, 160 (2016). "Modification of child custody may be ordered only when there has been a material, substantial and permanent change of circumstances indicating to the magistrate's satisfaction that a modification would be in the best interests of the child." *Id.* (quoting *Pieper v. Pieper*, 125 Idaho 667, 669, 873 P.2d 921, 923 (1994)). Idaho Code section 32-717 gives a judge wide discretion regarding custody decisions, subject to some restrictions, with the children's best interests being of paramount importance. I.C. § 32-717; *Hoskinson v. Hoskinson*, 139 Idaho 448, 455, 80 P.3d 1049, 1056 (2003). "[T]he determination

of whether to modify child custody is left to the sound discretion of the trial court, and this Court will not attempt to substitute its judgment and discretion for that of the trial court except in cases where the record reflects a clear abuse of discretion." *Levin v. Levin*, 122 Idaho 583, 586, 836 P.2d 529, 532 (1992).

In reviewing an exercise of discretion, this Court must consider: "(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason." *Evans v. Sayler*, 151 Idaho 223, 226, 254 P.3d 1219, 1222 (2011) (quoting *Chavez v. Barrus*, 146 Idaho 212, 225, 192 P.3d 1036, 1049 (2008)). Thus, the issue is whether there is substantial and competent evidence to support the magistrate's conclusion that changing physical custody was in the children's best interests. *Doe v. Doe*, 149 Idaho 669, 671, 239 P.3d 774, 776 (2010). An abuse of discretion occurs when the evidence is insufficient to support a magistrate's conclusion that the interests and welfare of the children would be best served by a particular custody award or modification. *McGriff v. McGriff*, 140 Idaho 642, 645, 99 P.3d 111, 114 (2004). Appellate courts, however, are not permitted to substitute their own view of the evidence for that of the trial court, or to make credibility determinations. *Id.*

## V. ANALYSIS

Father argues that the magistrate court abused its discretion when it altered the custody arrangement from Father having primary physical custody of the three youngest children to a 50/50 schedule without making new findings of fact. In Mother's cross-appeal, she asserts that this Court should not reach Father's arguments because the magistrate court erred as a matter of law in concluding that she alienated the children from Father. In other words, Mother challenges the magistrate court's September 1, 2015 Findings of Fact and Conclusions of Law, and argues that the facts did not warrant a change in the custody arrangement it ordered in the March 18, 2015 Order Regarding Custody, Visitation and Child Support and Judgment. Because Mother's issue on cross-appeal may be dispositive, it will be addressed first.

**A. Whether the magistrate court erred in modifying the custody arrangement from the First Custody Order.**

Mother asserts that the magistrate court erred in several respects in its September 1, 2015 Findings of Fact and Conclusions of Law, which warrant this Court reversing the modified custody arrangement the court ordered therein. Mother asserts that there was not a material and

substantial change in circumstances since the First Custody Order that would warrant a change in the custody arrangement from Mother having primary physical custody over all five children to Father having primary physical custody of the three youngest children and Mother having primary physical custody of the two eldest. Mother focuses primarily on the magistrate court's conclusion that she engaged in alienating behavior and argues that the evidence did not support such a conclusion. Furthermore, Mother argues that the magistrate court put too much emphasis on the alleged alienation and merely glossed over the factors it is required to consider under Idaho law. Finally, Mother argues that the magistrate erred in its findings of facts either by failing to make certain findings or by making certain findings that were clearly erroneous.

The question of whether a "material, permanent and substantial change in conditions" exists is a preliminary question to what changes in the custody order would be in the best interests of the child. *Evans*, 151 Idaho at 226, 254 P.3d at 1222. "The requirement reflects a policy against continuous relitigation and alteration of custody decisions." *Id.* (internal quotation omitted). In *Poesy v. Bunney*, 98 Idaho 258, 561 P.2d 400 (1977), this Court explained:

> While the material, permanent and substantial change standard is a sound legal principle, care must be exercised in its application. The tendency is to search for some greatly altered circumstance in an attempt to pinpoint the change called for by the rule. Thus, the emphasis is placed on defining some change, and making that change appear, in itself, to be material, permanent and substantial. This focus is misleading. The important portion of the standard is that which relates the change in conditions to the best interest of the child. The changed circumstance standard was designed, as a matter of policy, to prevent continuous re-litigation of custody matters. That policy goal, however, is of secondary importance when compared to the best interest of the child, which is the controlling consideration in all custody proceedings. The court must look not only for changes of condition or circumstance which are material, permanent and substantial, but also must thoroughly explore the ramifications, vis-a-vis the best interest of the child, of any change which is evident. What may appear by itself to be a small and insignificant change in circumstances may have significant effects insofar as children are concerned.

> Care must also be taken to avoid 'compartmentalizing' consideration of a child's best interest in successive attempts at custody modification. The best interest of a child, like its growth, is a matter of development. An emerging pattern which is not apparent in a first consideration may come into focus at some later time. The court should allow and consider all evidence relevant to a child's interest, not just that evidence which has emerged since previous orders.

*Id.* at 261–62, 561 P.2d at 403–04 (internal citations omitted). This Court has made it clear that whether a change in conditions is "material" or "substantial" depends upon the impact of the change on the children. *Evans*, 151 Idaho at 226, 254 P.3d at 1222.

Idaho Code section 32-717 provides a framework for the trial court in determining the best interests of the children in making a custody decision. *Brownson v. Allen*, 134 Idaho 60, 63, 995 P.2d 830, 833 (2000). The statute sets forth relevant, non-exhaustive factors to aid in the trial court's custody determination. *Id.* The statute provides,

> In an action for divorce the court may, before and after judgment, give such direction for the custody, care and education of the children of the marriage as may seem necessary or proper in the best interests of the children. The court shall consider all relevant factors which may include:
>
> (a) The wishes of the child's parent or parents as to his or her custody;
>
> (b) The wishes of the child as to his or her custodian;
>
> (c) The interaction and interrelationship of the child with his or her parent or parents, and his or her siblings;
>
> (d) The child's adjustment to his or her home, school, and community;
>
> (e) The character and circumstances of all individuals involved;
>
> (f) The need to promote continuity and stability in the life of the child; and
>
> (g) Domestic violence as defined in section 39-6303, Idaho Code, whether or not in the presence of the child.

I.C. § 32-717.

In this case, the magistrate ruled that there was "no question that there had been an ample showing of material and substantial changes of circumstances" because "there have been numerous changes to the summer schedules, Mother has engaged in alienating behaviors, A.O. and E.O. have virtually no relationship with Father, and Mother has moved in violation of the Court's order." The magistrate court correctly perceived the question of custody as one of discretion, as he cited to Idaho Code section 32-717 and considered the factors set forth therein in his analysis. However, the magistrate court did not act within the outer boundaries of its discretion, nor did it reach its decision by an exercise of reason when it altered the original custody schedule. From the record before this Court, the facts simply do not demonstrate a material and substantial change in circumstances sufficient to warrant the change in custody. The magistrate court focused heavily on Mother's "alienating behavior" in determining that there was a material and substantial change in circumstances. We simply cannot conclude, as a matter of

9

law, that there was sufficient evidence in the record to support a finding that Mother engaged in alienating behavior.

This Court has stated:

> The best welfare of minor children is promoted by having such children respect and love both parents. This is natural and every effort should be directed to the end that such respect and affection will not be destroyed and alienated; any other course is not in the interest of and for the best welfare of such minor children. . . .
>
> The acts and conduct of the custodial parent, resulting in the alienation of the love and affection which children naturally have for the other parent, is a vital and very serious detriment to the welfare of such children and is grounds for modification of the decree with respect to such custody.

*Thurman v. Thurman*, 73 Idaho 122, 128, 245 P.2d 810, 814 (1952). Consequently, "[m]odification of a decree awarding custody of minor children to a parent who is a fit and proper person to have such custody is proper where it appears that the custodial parent has contrived to prevent the other parent from seeing and visiting such children in the manner and spirit provided for in the decree, and has shaken their love and affection for the other parent." *Id.*

The magistrate court cited this principle of law and identified several facts that supported the conclusion that Mother engaged in alienating behavior. Specifically, the magistrate concluded that "[i]n this case, it is clear to this Court that [Mother] has engaged in alienating behaviors which initially damaged [Father's] relationship with [R.O.] and [P.O.] and has ruined [Father's] relationship with [A.O.] and [E.O.]. The court identified Mother's alienating behaviors as follows:

### -Idaho Falls move

> Mother's actions have all but destroyed Father's relationship with A.O. and E.O. This Court believes that the key factor in this regard was Mother's move to Idaho Falls. Before the move, Father had a great relationship with A.O. and E.O.. Since the move, it has been perhaps irretrievably broken.
>
> Mother showed a blatant disregard for Father's parental rights. Immediately after the March, 2013 trial, she took all of the children to Idaho Falls to let them pick which school they would like to attend. She also told them that they would be moving to Idaho Falls, and got them excited about the move. After Mother's unilateral move to Idaho Falls [Father] obtained the *Ex Parte Order*. It was not until after the hearing on the *Ex Parte Order*, that Mother moved back to Rexburg. And when this Court upheld its *Ex Parte Order* after the hearing, the children were furious with this Court and more importantly, Father. Mother's choices caused Father to be the "bad guy".

10

This Court cannot blame the children for being angry. The person to blame is Mother. She got the children's hopes up, when she should not have moved without Father's or the Court's permission. Then when she was forced to move back with the children, they wanted to confront Father. The correct response from Mother, should have been, "no, this is an issue between Father and I". Instead, she did not dissuade the children from confronting Father, and when they did, they were all extremely angry. In fact, from this point on, Father's relationship with A.O. and E.O. was tarnished.

Furthermore, Mother texted inappropriate matters to the children about Father. [. . . .]And after this text was brought up in Court, P.O.'s and R.O.'s phones became password protected.

### -Summer 2014

Mother, understandably, wanted to work in New Mexico for the summer of 2014. She and Father worked out a "deal" between themselves related to their parenting time for the summer of 2014. Thereafter, rather than simply telling the children that she and Father had worked out an arrangement for the summer of 2014, Mother sought approval from the children. When she did, the children were angry with Father and the summer 2014 arrangement. R.O., in particular, became very upset with Father. Since the children were upset, Mother decided to take this matter to the Court.

Father prevailed and received the parenting time he was seeking for the summer of 2014, and the children actually had a great time with this extended time. However, more damage was done to Father's relationship with the children, by Mother's actions.

### -Church

This Court is not concerned with whether the children attend church or not. The reason for the comments related to church, is to illustrate Mother's alienating behaviors. All of the []children were attending church during most of the parties' marriage. At this time, none of the children attend church, with the exception of D.O. It is odd to this Court that children as young as R.O. and P.O. would be so defiant against attending church. R.O.'s comments regarding church are disturbing as they are not the type of comments a child her age would make. This Court believes that E.O. has caused the younger children to not want to attend church. She physically prevented Father from taking P.O. to church and she talks negatively about religion to R.O. and the other children. Mother testified that she heard these comments, but that she did nothing to stop it. This is contrary to the views expressed by Mother in the first trial and the basis for the Court's awarding her primary custody.

Father, on the other hand, has not forced the children to go to church with him. He has not because he understands the conflict the children face with having one parent an active church-goer and the other not. This shows his ability to effectively coparent.

**[Mother's brother's] reception**

Father had planned to take all of the children in the summer of 2014 to [Mother's brother's] wedding reception. All of the children were excited to attend. Then, upon learning it would be at [their Maternal Grandparent's] home, all of the children became angry and refused to attend [Mother's brother's] reception. The only child who would attend with Father was D.O.

**-A.O. and E.O.**

A.O. and E.O. do not have much of a relationship with Father. In fact, E.O. will not even acknowledge Father at this time. The two older girls do not ever visit on the weeknight during the school year, or during the summer, and they are hardly there on the weekends. Mother is fine with this. She says she "does not want to damage her relationship" with these kids. While the Court can understand her motive, it cannot condone the same. Mother appears to want to be a friend as opposed to a parent to these children.

A.O. and E.O. appear to be good kids. They are smart. They get good grades. They follow the rules. They respect Mother. Mother rarely needs to punish them. However, Mother will not force them to see Father. She says the weeknight visits are not a big deal. It is her duty and obligation to ensure that these girls spend time with their dad. A.O. and E.O. respect Mother and they follow her rules. Mother should have insisted, as a parent, that the older girls should have visited their dad on his time. This is contrary to the views expressed by Mother in the first trial and the basis for the Court's awarding her primary custody.

Unfortunately, the situation with A.O. and E.O. has gotten to the point that they really have no relationship with Father. The Court truly believes that this is the fault of Mother. It started with the Idaho Falls move, and it continued with Mother's alienating behaviors. Mother could have ensured that these girls continued to have a good relationship with Father, but she chose not to do so, because she wanted to be their friend, instead.

**-Discussing legal proceedings with A.O. and E.O.**

Mother admitted that she has discussed the pending legal proceedings with A.O. and E.O. She told them about the trial, about the fact that Father was seeking custody, about the fact that she was having her deposition taken, about the fact that she and Father were meeting to try and settle the case, and about the fact that this litigation was costing her money. It should not come as a surprise that A.O. and E.O. are angry with Father. Mother has forced them to take a side by involving them in this matter, and they have chosen Mother's side. Mother should not be discussing these legal proceedings with A.O. and E.O.

Fortunately, Mother has not been discussing these proceedings with the three younger children. This is paying off, as Father's relationship with the younger three children is excellent, though Father really had to work at it after the Idaho Falls.

The facts before this Court do not indicate that Mother was contriving to deprive Father from reasonable visitation, and there are certainly no facts to indicate that Mother engaged in a systematic effort to shake the love and affection that the children have for Father. To the contrary, the evidence in the record demonstrates that Mother encouraged the children to go to Father's visitations. Indeed, the parties' three youngest children always went with Father for their scheduled visitations. Although the two eldest children may have missed some of Father's visitations, it was not because Mother acted to prevent such visitation, but rather because the eldest children did not want to go to Father's. Furthermore, we unequivocally conclude that the evidence the magistrate court focused on to determine Mother was engaging in alienating behavior is insufficient as a matter of law to establish alienation.

As a preliminary matter, although we recognize that the magistrate court indicated that its decision in the Second Custody Order had nothing to do with religion, the religious overtones in the Second Custody Order strongly suggest otherwise. Therefore, we reiterate and emphasize that in custody disputes, courts "must refrain from entering the tangled web of religion altogether." *Osteraas v. Osteraas*, 124 Idaho 350, 354, 859 P.2d 948, 952 (1993) (citing *Compton v. Gilmore*, 98 Idaho 190, 192, 560 P.2d 861, 863 (1977)). Indeed, this Court has stated that when trial courts do not follow the established rule of noninterference in religious matters in child custody cases without an affirmative showing of compelling reasons to do so, it is tantamount to a manifest abuse of discretion. *Id.* (quoting *Munoz v. Munoz*, 489 P.2d 1133, 1135 (Wash. 1971)). Therefore, to the extent that religion was a factor in the magistrate court's decision to alter the original custody arrangement in this case, it was a manifest abuse of discretion.

The magistrate court indicated at the November 25, 2015 hearing that it did not consider religion in reaching its decision, but that it was an example of Mother allowing E.O. to "indoctrinate" the younger children with her negative views about the LDS Church. Idaho law does not stand for the proposition that divorced parents must prevent their children from expressing their own views and opinions on matters to their siblings simply because they may not be in line with the other parent's beliefs or views. This is particularly true when, as here, there is only evidence of isolated incidents rather than a pattern of conduct designed to drive a wedge between the children and the other spouse. There are often discussions that occur between

13

siblings, and without proof of Mother instigating or conniving to manipulate the children, or even being present during such conversations is speculative.

The magistrate court also focused heavily on Mother's Idaho Falls move and the events surrounding it to conclude that Mother was engaging in alienating behavior. However, as counsel for Father acknowledged at oral argument, the divorce decree did not prohibit Mother from moving. Furthermore, Idaho Falls is only twenty-eight miles, or approximately a thirty minute drive, from Rexburg. At oral argument, counsel for Father argued that the move would disrupt Father's relationship with the children because he would not have daily contact with the children—Father could not go to their schools, parent-teacher interviews, and so forth. Father also testified that the extra distance would make it difficult for Father to get the children to school and then himself to work on time. However, Father testified at trial that it took ten minutes to get to the children when they lived in Rexburg. Requiring Father to drive an additional twenty minutes to Idaho Falls is little additional burden.

In any event, and most importantly, there was nothing in the divorce decree that specified Father had these rights. We simply cannot see how a thirty-minute drive would disrupt the children's relationship with Father in such a way that would be detrimental to the children's best interests. Although it may have been an inconvenience for Father, the distance was not so great as to be detrimental to Father's relationship with the children, nor to prevent Father from exercising his visitation rights. Mother's attempt to move the children such a short distance away does not, as a matter of law, constitute alienation especially since the divorce decree did not preclude Mother from moving.

In fact, much of the magistrate's reasoning depends on Mother's decision to move. The magistrate court also focused on Mother's actions following the move to Idaho Falls, and how those actions were further evidence of Mother's alienating behavior. Specifically, the magistrate court focused on the fact that Father's relationship with the children became strained after the court ordered Mother to move back to Rexburg from Idaho Falls with the children. The court found it problematic that Mother told the children about the court proceedings and the reason they were moving back to Rexburg, citing those discussions as the principal reason for Father's strained relationship with the children, and in particular, the two eldest children. Additionally, the court disapproved of Mother having discussed legal proceedings outside of those related to the move with the two eldest children. Having an open and honest discussion with teenaged

14

children about the court proceedings and the reason why they were required to move back to Rexburg, particularly when the children explicitly ask for the details, is not unreasonable and certainly does not constitute alienation. The evidence does not suggest that Mother engaged in a systematic effort to alienate the children from Father or to shake the foundation of the children's love and affection for their Father.

Indeed, there is no evidence, except for one text sent in a group message between Mother and the children, that Mother said anything negative to the children regarding Father. One text message, on its own, does not illustrate a systematic effort by Mother to alienate the children from Father. *See Adams v. Adams*, 93 Idaho 113, 116, 456 P.2d 757, 760 (1969). Outside of that one text message, the evidence in the record indicates that Mother accommodated visitation and encouraged the children to go on their visitations with Father. The evidence further shows that Mother kept information from the children that would have surely damaged their relationship with Father. As the magistrate court noted in the transcript on the motion to reconsider,

> [i]f [Mother] really wanted to stick it to [Father], nothing would have hurt those kids more than to thin[k] their dad was recording their conversations. Those kids would have been hurt. I mean, girls at that age, they want their privacy, and to think their privacy was being used to further their dad's own position, it could have been detrimental.

Withholding such information from the children demonstrates that Mother was mindful of the effect it would have on the children and their relationship with Father—it certainly does not show that Mother was engaging in a pattern of conduct designed to alienate Father from the children.

With respect to the events in the summer of 2014, we cannot conclude that Mother engaged in alienating behavior by seeking help from the court regarding an appropriate custody arrangement for that summer when the parties could not reach an agreement on their own. The court found it problematic that Mother sought the children's approval on custody arrangement she and Father had agreed upon for the summer rather than just telling them what the arrangement would be. There is no indication that Mother sought the children's approval in an attempt to alienate Father from the children. A parent should not be punished for seeking input from her children regarding such matters, and surely should not be punished for seeking help from the court when the parties could not reach an agreement. These events do not amount to alienation.

15

As to the ring ceremony, the events surrounding the ceremony occurred while Father had custody of the children, and the court made no finding that it was Mother's actions that caused the children to refuse to attend the ring ceremony, nor that Mother in some way influenced the children's decision. Furthermore, there is nothing tying the children's refusal to attend Mother's brother's ring ceremony to their relationship with Father. Those facts do not support the conclusion that Mother was engaging in alienating behavior.

Finally, the magistrate court focused on the strained relationship between Father and E.O. and A.O. as further support for the court's conclusion that Mother engaged in alienating behavior. Again, we cannot agree. The court blames Mother for the strained relationship and found that it started with the Idaho Falls move and continued as a result of Mother's alienating behaviors. Furthermore, the court found it problematic that Mother did not force E.O. and A.O. to go on their visitations with Father because she does not want to damage her relationship with E.O. and A.O. However, as stated above, the record reflects that Mother encouraged all of the children to go to visitation with Father and that the three youngest always went. Although E.O. and A.O. did not always go, there is no evidence in the record to indicate that Mother engaged in a systematic effort to prevent them from visiting Father. Instead, the facts indicate that the two teenaged children chose not to go on their own volition. While Mother should encourage the children to go on visitation with Father, there is scant evidence in the record that she actively inhibited or undermined Father's visitation rights. We simply cannot conclude that Father's strained relationship with his two teenaged children amounts to alienation on Mother's part.

Father argues that although there are several minor incidents that, on their own, might not amount to alienation, when they are all considered in totality, it surely amounts to alienation. We cannot agree. The foregoing facts that the magistrate court relied on to show alienation do not, even in the aggregate, constitute substantial evidence to support a finding of alienation. They do not justify the court's drastic change in the custody arrangement. Indeed, without a finding of alienation, there are no other facts to indicate there was a material and substantial change in circumstances that would warrant a change in custody.

The magistrate court found that numerous changes to the summer schedules, Mother's alienating behavior, A.O. and E.O.'s strained relationship with Father, and Mother's move to Idaho Falls in violation of the court's order all indicated that there was a material and substantial change in circumstances to warrant a change in custody. We reiterate that whether there has been

16

a material and substantial change in circumstances is dependent upon the impact of the changes upon the children. *Evans v. Sayler*, 151 Idaho 223, 226, 254 P.3d 1219, 1222 (2011). First, as we concluded above, the evidence was insufficient to show that Mother engaged in alienating behaviors. The remaining facts the court focused on do not demonstrate a material and substantial change in circumstances that warranted a change in custody.

First, the change to the summer schedule occurred over one summer, was a change that was ordered by the court, and was only temporary. Such a brief change in summer schedule does not amount to a material and substantial change in circumstances, particularly when the court made no findings as to the effect the temporary change had on the children. Similarly, the move to Idaho Falls was not a material and substantial change in circumstances. Mother returned with the children to Rexburg upon the court's order to do so. Finally, E.O. and A.O.'s strained relationship with Father was not a material and substantial change in circumstances that would warrant giving primary physical custody of the three younger children to Father. This Court is simply unable to conclude that, based on the record before it, there was a material and substantial change in circumstances that warranted the change in the original custody arrangement. We hold that the magistrate court abused its discretion when it altered the original custody arrangement to award Father primary physical custody over the parties' three youngest children.

Because we hold that the magistrate abused its discretion when it changed the initial custody arrangement, we do not reach Father's arguments on appeal.

**B. Whether either party is entitled to attorney fees on appeal.**

Both parties seek attorney fees on appeal pursuant to Idaho Code section 12-121. Idaho Code section 12-121 provides that a court in any civil action may award reasonable attorney fees to the prevailing party. I.C. § 12-121. This Court has held that attorney fees can be awarded on appeal under Idaho Code section 12-121 "only if the appeal was brought or defended frivolously, unreasonably, or without foundation." *Doe v. Doe*, 149 Idaho 669, 675, 239 P.3d 774, 780 (2010) (citing *Gustaves v. Gustaves*, 138 Idaho 64, 71, 57 P.3d 775, 782 (2002)). We cannot conclude that either party's conduct in this appeal was frivolous, unreasonable, or without foundation.

## VI.    CONCLUSION

We reverse the magistrate's decision modifying the custody arrangement from the First Custody Order, which granted Father primary physical custody over the parties' three youngest

17

children and Mother primary physical custody over the two eldest children. We remand to the magistrate court to reinstate the custody arrangement from the First Custody Order, which granted Mother primary physical custody over the parties' five children. We decline to award attorney fees to either party on appeal. Costs to Mother.

Chief Justice J. JONES, EISMANN, W. JONES and HORTON, **CONCUR.**